PHILIP BARRET *vs.* CHARLES W. TAYLOR, ET AL.

*Elections and Voters—Right of Persons to be Registered who Become Naturalized and of Age After the First Sitting of the Registers.*

The Act of 1896, chap. 202, provides that persons constitutionally qualified shall be registered as voters at the September sittings of the registers. Section 21 of the Act provides that the registers shall sit in October for the purpose of revising their registry, and no new name shall then be added. In September the appellant applied to the registers, stating that he was then an unnaturalized foreigner under twenty-one years of age, but that he would come of age on October 13th following and would on that date apply for naturalization, and, if successful, present the papers to the registers. His name was entered as an applicant on the duplicate lists, but registration was refused. On October 13th the applicant being then of age, was naturalized, and on the same day presented his naturalization papers to the registers, who were in session under said section 21. *Held,* that he was entitled to be registered as a voter.

Appeal from an order of the Circuit Court for Anne Arundel County (REVELL, J.), dismissing the petition of the appellant asking that his name be entered on the registration books as a legal voter. The agreement of facts, upon which the appeal was argued, is as follows : " On the 15th day of September, 1896, the petitioner, who had not attained the age of 21 years, and who was foreign born, applied to the aforesaid registers of voters for registration. His name was entered as an applicant for registration in the duplicate registries, and all proper entries were made therein until the question of naturalization was reached, when the petitioner stated that he was not yet naturalized and that he would not attain the age of 21 years until the 13th day of October, 1896, the final day for revision of the registries, upon which day he would apply to the Court for naturalization, and if he should be granted naturalization, he would then present

the papers to the registers of voters in order to enable them to complete the proper entries. The petitioner did apply to the Court for the naturalization papers on the 13th of October, 1896; the Court granted them, and he presented them to the registers aforesaid, who refused to enter his name on the registry books as a legal and qualified voter; from which decision the petitioner appealed to the Circuit Court for Anne Arundel County, and upon hearing by the Court, the order applied for was refused and the petition for registration was dismissed."

The cause was argued before McSHERRY, C. J., BRYAN, FOWLER, PAGE and ROBERTS, JJ.

*James W. Owens*, for the appellant.

*James M. Munroe*, for the appellees.

BRYAN, J., delivered the opinion of the Court.

Philip Barret applied to the registers of voters for registration. His name was entered in the duplicate registries, and sundry entries were made; but in the course of the examination he stated that he was an unnaturalized foreigner and that he was under the age of twenty-one years. He also stated that he would become of full age on the thirteenth day of October, eighteen hundred and ninety-six, and that he would on that day apply to the proper Court for naturalization, and that if he should be successful in his application he would present his naturalization papers to the registers in order that the necessary entries in their books might be completed. Barret was duly naturalized on the thirteenth of October, having reached his full age. On that day the registers were in session for the purpose of revising their registry. Barret exhibited to them his naturalization papers in order that he might be registered, but the registers refused to enter his name on the lists as a legal and qualified voter. He filed a petition in the Circuit Court praying that the registry should be corrected by the entry

of his name as a qualified voter.    The Court dismissed his
petition and he appealed.

This case was presented to us at our last daily session
before the November election.    We decided it promptly ;
but as the matter did not admit of delay we made the neces-
sary orders without filing an opinion in the usual form.    We
now proceed to state the reasons for the conclusions to
which we came.    When Barret appeared the second time
before the registers he had all the constitutional qualifica-
tions requisite for the right of suffrage.    If in consequence
of the legislation on the subject he is to be prevented from
the exercise of that right, the result will be most unfortu-
nate.    It would be a subject of great regret if a statute, en-
acted for the purpose of registering the names of persons
who possess the qualifications for voting which are pre-
scribed by the Constitution, should operate in such a man-
ner as to exclude from the registry a qualified voter who
has been guilty of no neglect or default in presenting his
claim for registration.    The Constitution is most express in
requiring the Legislature to provide by law for the regis-
tration of all who possess the requisite qualifications.    It
would be most unjust to suggest that the Legislature has
not faithfully endeavored to discharge this duty.    Certainly
we could not depart from official duty and propriety so far
as to assume the possibility of such a thing.    We will ex-
amine the statute and see whether its text indicates that the
legislative wish has been defeated.    It is the Act of 1896,
chapter 202.    Paragraph 4 of section sixteen is as follows :
" Only persons constitutionally qualified to vote    *    *    *
at the next election, and personally applying for registration,
shall be registered as qualified voters."    When Barret ap-
plied the first time he was not qualified and therefore regis-
tration was properly refused.    His name was entered on
the registration books, and in the column relating to quali-
fied voters the unfavorable judgment of the registers was
recorded.    In due course they met in obedience to the
twenty-first section of the Act.    This section enacts that

" they shall remain in session for the sole purpose of revising their registry, and no new name shall be added." In the meantime he had become a qualified voter, and his name was already on the books. The registers were in session solely for the purpose of revising their registry. How were they to revise it, except by setting it right in the particulars wherein it was wrong? If errors had been committed in respect to names on the books, they were to be corrected. It is nothing to the purpose that their judgment was right on the facts which existed when it was pronounced. In the course of the changes which had occurred, new conditions had arisen ; and upon them their adjudication was erroneous and unjust. In the work of revision were they to refuse to see what was before their eyes, and to found their judgment on incidents which at one time had been facts, but which from changed circumstances had no more relation to the matter for decision than the events of the last generation? Were they to pronounce a true judgment, or to sustain one which they knew to be erroneous and unjust? Was the party's right of suffrage any less the object of the law's care and protection because it had been recently acquired? Could the statute be construed to impair or defeat it, in the absence of a declaration most express and unequivocal? These officers were appointed for the purpose of registering persons entitled to vote at the next election, provided they should make personal application. And here a man appears whose qualification to vote is perfect and absolute. The highest political right of the citizen is in question ; and it is claimed under a statute framed for the purpose of securing it. Means are provided whereby the registers are to ascertain whether this right exists, and to enable the claimant to exercise it where he is entitled to it. When the right is unquestioned it would be unreasonable in the highest degree to defeat it by the use of those very means which were devised for the purpose of preserving it. And yet this would be the result if we limit and restrict the duty of revision imposed on the registers, so as to prevent them from considering the facts as they exist when the

revision is to be made.   An analogy of a forced and un-
natural character may be suggested, which is drawn from
the practice of Appellate Courts in revising decisions at
law on bills of exception.   The object then is to deter-
mine whether the Court of original jurisdiction had ren-
dered a correct decision on the facts presented to it, and to
revise its ruling on the case as it appeared at the trial.   It
is difficult to suppose that the Legislature could have trav-
elled so far out of the plain, straightforward path as to have
designed such a mode of correcting errors in the registra-
tion list.   They were dealing with great public rights,
which were of the highest concern to every citizen in the
State, and they provided means for producing a result which
every good citizen must desire.   That is, they intended that
the registration list when it left the hands of the registers
in its final shape should be as correct as it could be made.
And they intended that the appointed means should be used
so as to produce this result, and not to defeat it.   These
means are not to be hampered by technical and artificial
rules adapted to another department of the public business ;
but they are to be applied as men of sagacity and judgment
in the affairs of life would employ them in accomplishing
the object of paramount public importance for which they
were instituted.   The law would fail in its object if it de
nied to any one qualified voter the opportunity of being
registered.

   On the day when this cause was argued we decided that
Barret was entitled to registration, and we ordered that his
name should be entered on the lists.   We now repeat in a
more formal manner what we said at that time.

                            *Reversed and remanded.*

   (Decided *per curiam* October 30th, 1896; the aforegoing opinion be-
ing filed February 18th, 1897.).